Bart SIPRIANO, Harold Fain, and
Doris Fain, Petitioners,

v.

GREAT SPRING WATERS OF AMER-
ICA, INC. a/k/a Ozarka Natural
Spring Water Co. a/k/a Ozarka Spring
Water Co. a/k/a Ozarka, Respondents.

No. 98–0247.

Supreme Court of Texas.

Argued Nov. 19, 1998.

Decided May 6, 1999.

Richard E. Swift, Jr., Pamela Rea, Pal-
estine, for Petitioners.

Boris A. Hidalgo, Christopher Paul
Hanslik, Houston, for Respondents.

Justice ENOCH delivered the opinion
for a unanimous Court.

For over ninety years, this Court has
adhered to the common-law rule of capture
in allocating the respective rights and lia-
bilities of neighboring landowners for use
of groundwater flowing beneath their
property. The rule of capture essentially
allows, with some limited exceptions, a
landowner to pump as much groundwater
as the landowner chooses, without liability
to neighbors who claim that the pumping
has depleted their wells. We are asked
today whether Texas should abandon this
rule for the rule of reasonable use, which
would limit the common-law right of a
surface owner to take water from a com-
mon reservoir by imposing liability on
landowners who "unreasonably" use
groundwater to their neighbors' detriment.
Relying on the settled rule of capture, the
trial court granted summary judgment
against landowners who sued a bottled-
water company for negligently draining
their water wells. The court of appeals
affirmed.[1] Because we conclude that the
sweeping change to Texas's groundwater
law Sipriano urges this Court to make is
not appropriate at this time, we affirm the
court of appeals' judgment.

Henderson County landowners Bart Si-
priano, Harold Fain, and Doris Fain (Si-
priano) sued Great Spring Waters of
America, Inc., a/k/a Ozarka Natural Spring
Water Co., for negligently draining their
water wells. According to Sipriano's alle-
gations, which we take as true for sum-
mary judgment purposes, Ozarka, in 1996,

---

1. 973 S.W.2d 327.

began pumping about 90,000 gallons of groundwater per day, seven days a week, from land near Sipriano's. Soon after the pumping began, Sipriano's wells were severely depleted. Sipriano sought injunctive relief, as well as actual and punitive damages for Ozarka's alleged nuisance, negligence, gross negligence, and malice.

Ozarka moved for summary judgment, asserting that Texas does not recognize Sipriano's claims because Texas follows the rule of capture. Sipriano argued in response that the claims fell within recognized exceptions to the rule of capture, and that in any event Texas should abandon the rule and replace it with the rule of reasonable use. (Before this Court, Sipriano waived his argument that his pleadings stated a claim under a recognized exception to the rule of capture because he did not argue it in his brief on the merits, electing to present only the argument that the rule of capture should be abandoned.[2]) Disagreeing with Sipriano, the trial court granted summary judgment for Ozarka. The court of appeals affirmed, concluding that "for so well-settled law as the [rule of capture], we conclude that it would be more appropriate for the legislature or the Supreme Court of Texas to fashion a new rule if it should be more attuned to the demands of modern society."[3]

This Court adopted the common-law rule of capture in 1904 in *Houston & Texas Central Railway Co. v. East.*[4] The rule of capture answers the question of what remedies, if any, a neighbor has against a landowner based on the landowner's use of the water under the landowner's land.

Essentially, the rule provides that, absent malice or willful waste, landowners have the right to take all the water they can capture under their land and do with it what they please, and they will not be liable to neighbors even if in so doing they deprive their neighbors of the water's use.[5] Rooted in English common law, the rule of capture was perhaps first enunciated in 1843 in *Acton v. Blundell:*

> [T]hat person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description *damnum absque injuria* [an injury without a remedy] which cannot become the ground of an action.[6]

In *East,* this Court faced a choice between the rule of capture and its counterpart, the rule of reasonable use.[7] No constitutional or statutory considerations guided or constrained our selection at that time. Articulating two public-policy reasons, we chose the rule of capture. First, we noted that the movement of groundwater is "so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to [it] would be involved in hopeless uncertainty, and would, therefore, be practically impossible."[8] And second, we determined that "any ... recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage and agriculture, mining, the

**2.** *See* Tex.R.App. P. 55.2(i).

**3.** 973 S.W.2d at 329–30.

**4.** 98 Tex. 146, 81 S.W. 279 (1904).

**5.** *See id.* at 280; *see also Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 625–26 (Tex.1996); *Friendswood Dev. Co. v. Smith–Southwest Indus., Inc.,* 576 S.W.2d 21, 25 (Tex.1978); *City of Corpus Christi v. City of Pleasanton,* 154 Tex. 289, 276 S.W.2d 798, 800 (1955).

**6.** 152 Eng. Rep. 1223, 1235 (Ex. Ch. 1843), *quoted in East,* 81 S.W. at 280.

**7.** *See Bassett v. Salisbury Mfg. Co.,* 43 N.H. 569, 577 (1862); *see also* Restatement (Second) of Torts § 858 (1979).

**8.** *East,* 81 S.W. at 281 (quoting *Frazier v. Brown,* 12 Ohio St. 294, 311 (Ohio 1861)).

construction of highways and railroads, with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility."[9] Thus, we refused to recognize tort liability against a railroad company whose pumping of groundwater under its own property allegedly dried the neighboring plaintiff's well.[10]

After droughts in 1910 and 1917,[11] the citizens of Texas voted in August 1917 to enact section 59 of article 16 of the Texas Constitution, which placed the duty to preserve Texas's natural resources on the State:

> The conservation and development of all of the natural resources of this State . . . and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.[12]

This constitutional amendment, proposed and passed after our common-law decision in *East,* made clear that in Texas, responsibility for the regulation of natural resources, including groundwater, rests in the hands of the Legislature.

By 1955, this Court recognized that what was "secret [and] occult" to us in 1904—the movement of groundwater—was no longer so.[13] But in *City of Corpus Christi v. City of Pleasanton* we continued to adhere to the rule of capture.[14] In so doing, however, we expressly recognized what was tacit in *East*—that the rule of capture is not absolute:

> Having adopted the . . . rule [of capture] it may be assumed that the Court adopted it with only such limitations as

existed in the common law. What were those limitations? About the only limitations applied by those jurisdictions retaining the . . . rule [of capture] are that the owner may not maliciously take water for the sole purpose of injuring his neighbor, or wantonly and willfully waste it.[15]

Thus, while we noted that the common law did not preclude a landowner from capturing and selling water for use off the land,[16] we nonetheless made clear that the rule of capture has exceptions in Texas.

But our discussion of the rule of capture in *City of Corpus Christi* was incidental to the issue we decided. We were called on in that case to construe a statute that recognized the common-law right to use artesian water off the premises and to transport it in any of several enumerated ways, including by "river, creek or other natural water course or drain, superficial or underground channel, bayou, . . . sewer, street, road, [or] highway."[17] But the statute also defined as "waste" any such transportation of water "unless it be used for the purposes and in the manner in which it may be lawfully used on the premises of the owner of such well."[18] Specifically, we considered whether it was waste to transport water produced from artesian wells by flowing it down a natural stream bed and through lakes, given that loss of some of the water through evaporation, transpiration, and seepage was inevitable. While there was evidence that at times as much as 74% of the water was lost, we held that this use of underground water

---

9. *Id.* (quoting *Frazier,* 12 Ohio St. at 311).

10. *See id.* at 282.

11. *See Barshop,* 925 S.W.2d at 626.

12. Tex. Const. art XVI, § 59(a).

13. *See City of Corpus Christi,* 276 S.W.2d at 805–06 (Wilson, J., dissenting).

14. *See id.* at 801.

15. *Id.* at 801 (citations omitted).

16. *Id.* at 801–02 (citing *Texas Co. v. Burkett,* 117 Tex. 16, 296 S.W. 273, 278 (1927)).

17. *City of Corpus Christi,* 276 S.W.2d at 800 (quoting Tex.Rev.Civ. Stat. art. 7602 (Vernon 1925) (repealed)).

18. *Id.*

was not waste under the statute.[19] Importantly, we expressly noted that the 1917 constitutional amendment imposed on the Legislature the duty to regulate groundwater:

> [T]he Amendment was not self-enacting. By the very terms of the Amendment the duty was enjoined upon the Legislature to implement the public policy found therein. It was said: " . . . and the Legislature shall pass all such laws as may be appropriate thereto." No such duty was or could have been delegated to the courts. It belongs exclusively to the legislative branch of the government.[20]

Thus we recognized the Legislature's broad powers to regulate use of groundwater following the 1917 amendment, even within the common-law tort framework established by the rule of capture.

In 1978, in *Friendswood Development Co. v. Smith–Southwest Industries, Inc.*,[21] we were again invited to abandon the rule of capture and adopt the rule of reasonable use. Again, we declined. But again we recognized that the rule of capture is not without exception. Specifically, we "agree[d] that some aspects of the . . . common law rule as to underground waters are harsh and outmoded, and [that] the rule ha[d] been severely criticized since its reaffirmation by this Court in 1955."[22] Thus, we used *Friendswood* to "discard an objectionable aspect of the court-made . . . rule [of capture] as it relates to subsidence."[23] Specifically, we recognized an exception to the rule for a landowner's negligence that proximately causes the subsidence of another's land.[24]

We most recently discussed the rule of capture in 1996 in *Barshop v. Medina County Underground Water Conservation District*.[25] In *Barshop*, we rejected facial constitutional challenges to the Edwards Aquifer Act. The Act imposed caps on groundwater withdrawals within the jurisdiction of the Edwards Aquifer Authority, and vested the Edwards Aquifer Authority with substantial authority to regulate groundwater withdrawals by well from the aquifer.[26] The Legislature passed the Act because it was " 'necessary, appropriate, and a benefit to the welfare of this state to provide for the management of the [Edwards A]quifer.' "[27] Our discussion of the rule of capture in that case was for the limited purpose of providing the historical common-law framework within which the Legislature acted and within which the plaintiffs made their claims against the Act. We found that the Act withstood various constitutional challenges. And in rejecting the plaintiffs' contentions that the Act had no rational basis and was overbroad, we reiterated the Legislature's constitutional charge to regulate groundwater:

> Water regulation is essentially a legislative function. The [1917 constitutional amendment] recognizes that preserving and conserving natural resources are public rights and duties. The Edwards Aquifer Act furthers the goals of the [1917 amendment] by regulating the Edwards Aquifer, a vital natural resource which is the primary source of water in south central Texas. The specific provisions of the Act, such as the grandfa-

---

19.  *See id.* at 800, 803.

20.  *Id.* at 803.

21.  576 S.W.2d 21.

22.  *Id.* at 28–29.

23.  *Id.* at 30.

24.  *See id.*

25.  925 S.W.2d 618.

26.  Act of May 30, 1993, 73 d Leg., R.S., ch. 626, §§ 1.08, 1.14, 1993 Tex. Gen. Laws 2350, 2356, 2360, *amended by* Act of May 29, 1995, 74 th Leg., R.S., ch. 261, 1995 Tex. Gen. Law 2505.

27.  *Barshop*, 925 S.W.2d at 623–24 (quoting Act of May 30, 1993, 73 d Leg., R.S., ch. 626, § 1.06, 1993 Tex. Gen. Laws 2350, 2355–56, *amended by* Act of May 29, 1995, 74 th Leg., R.S., ch. 261, 1995 Tex. Gen. Laws 2505).

thering of existing users, the caps on water withdrawals, and the regional powers of the Authority, are all rationally related to legitimate state purposes in managing and regulating this vital resource.[28]

Now, Sipriano asks us to fundamentally alter the common-law framework within which Texas has operated since the 1904 *East* decision. That common-law framework existed in 1917 when the citizens of Texas charged the Legislature with the constitutional duty to preserve groundwater through regulation. It persisted through our decisions in *City of Corpus Christi* in 1955 and *Friendswood* in 1978. And it was firmly in place when the Legislature passed the Edwards Aquifer Act and when we decided *Barshop*. Like the voters who passed the 1917 constitutional amendment, this Court has consistently recognized "the need for legislative regulation of water."[29] Today, again, we reiterate that the people have constitutionally empowered the Legislature to act in the best interest of the State to preserve our natural resources, including water. We see no reason, particularly because of the 1917 constitutional amendment, for the Legislature to feel constrained from taking appropriate steps to protect groundwater. Indeed, we anticipated legislative involvement in groundwater regulation in *East*:

> In the absence ... of positive authorized legislation, as between proprietors

of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtrating through the earth.[30]

With the allocation of responsibility for groundwater regulation contemplated by the 1917 amendment in mind, it is important that this case comes to us on the heels of Senate Bill 1,[31] which has been described as a "comprehensive water management bill."[32] Passed in June 1997, Senate Bill 1 revamped significant parts of the Water Code and other Texas statutes in an attempt to improve on this State's water management. Perhaps most relevant to our decision today is the Legislature's efforts to streamline the process for creating groundwater conservation districts and to make them more effective in the water management process. Indeed, the Legislature expressly stated that "[g]roundwater conservation districts ... are the state's preferred method of groundwater management."[33]

The Legislature first exercised its constitutional authority to create groundwater conservation districts in 1949.[34] And since then the Legislature has repeatedly revisited and modified the operation of groundwater conservation districts.[35] Now, with Senate Bill 1, the Legislature has given more authority to locally-controlled groundwater conservation districts for establishing requirements for groundwater

---

**28.** *Id.* at 633.

**29.** *Id.* at 626; *see also Friendswood*, 576 S.W.2d at 30; *City of Corpus Christi*, 276 S.W.2d at 803.

**30.** *East*, 81 S.W. at 280 (quoting *Frazier*, 12 Ohio St. at 311) (emphasis added).

**31.** *See* Senate Bill 1, Act of June 1, 1997, 75 th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws 3610.

**32.** Senator J.E. "Buster" Brown, *Senate Bill 1: We've Never Changed Texas Water Law this Way Before*, 28 St. B. Tex. Envtl. L.J. 152, 153 (1998).

**33.** Tex. Water Code § 36.0015.

**34.** *See* Act of May 19, 1949, 51 st Leg., R.S., ch. 306, 1949 Tex. Gen. Laws 559.

**35.** *See* Act of May 24, 1955, 54 th Leg., R.S. ch. 496, §§ 1–8, 1955 Tex. Gen. Laws 1239, 1239–42; Act of May 11, 1961, 57 th Leg., R.S. ch. 493, 1961 Tex. Gen. Laws 1095; Act of May 24, 1973, 63 rd Leg., R.S., ch. 598, 1973 Tex. Gen. Laws 1641; Act of May 8, 1985, 69 th Leg., R.S., ch. 133, §§ 5.01, 6.04, 1985 Tex. Gen. Laws 617, 641–54; Act of May 29, 1989, 71 st Leg., R.S., ch. 936, 1989 Tex. Gen. Laws 3981; Act of May 27, 1991, 72 d Leg., R.S., ch. 701, 1991 Tex. Gen. Laws 2506.

withdrawal permits[36] and for regulating water transferred outside the district.[37] Senate Bill 1 also revised the "critical area" designation process to require the Texas Natural Resource Conservation Commission and the Texas Water Development Board to identify areas anticipated to experience critical groundwater problems,[38] and streamlined the process by which the TNRCC or the Legislature can create a district in these areas.[39] Senate Bill 1 also included various provisions calling for more comprehensive and coordinated water planning.[40] While the efficacy of the groundwater management methods the Legislature chose and implemented through Senate Bill 1 has been a matter of considerable debate, as the *amicus* briefs filed in this case reflect,[41] we cannot say at this time that the Legislature has ignored its constitutional charge to regulate this natural resource.

By constitutional amendment, Texas voters made groundwater regulation a duty of the Legislature. And by Senate Bill 1, the Legislature has chosen a process that permits the people most affected by groundwater regulation in particular areas to participate in democratic solutions to their groundwater issues.[42] It would be improper for courts to intercede at this time by changing the common-law framework within which the Legislature has attempted to craft regulations to meet this state's groundwater-conservation needs. Given the Legislature's recent actions to improve Texas's groundwater management, we are reluctant to make so drastic a change as abandoning our rule of capture and moving into the arena of water-use regulation by judicial fiat. It is more prudent to wait and see if Senate Bill 1 will have its desired effect, and to save for another day the determination of whether further revising the common law is an appropriate prerequisite to preserve Texas's natural resources and protect property owners' interests.

We do not shy away from change when it is appropriate. We continue to believe that "the genius of the common law rests in its ability to change, to recognize when a timeworn rule no longer serves the needs of society, and to modify the rule accordingly."[43] And Sipriano presents compelling reasons for groundwater use to be regulated. But unlike in *East*, any modification of the common law would have to be guided and constrained by constitutional and statutory considerations. Given the Legislature's recent efforts to regulate groundwater, we are not persuaded that it is appropriate today for this Court to insert itself into the regulatory mix by substituting the rule of reasonable use for the current rule of capture. Ac-

**36.** *See* Tex. Water Code § 36.113.

**37.** *See id.,* § 36.122.

**38.** *See id.,* § 35.008.

**39.** *See id.,* § 35.018.

**40.** *See id.,* §§ 11.134, 11.151, 16.053, 36.1071–.1073.

**41.** *Amici* generally in favor of retention of the rule of capture include the City of Houston, Texas Council of Forest Products Manufacturers, Texas Water Conservation Association, Texas Groundwater Association, Texas Alliance of Groundwater Districts, Edwards Aquifer Authority, High Plains Underground Water Conservation District, North Plains Groundwater Conservation District, Panhandle Groundwater Conservation District, Sandy Land Underground Water Conservation District, Mesa Underground Water Conservation District, South Plains Underground Water Conservation District, North Plains Ground Water Conservation District No. 2, American Land Foundation, Riverside and Landowners Protection Coalition, Texas Justice Foundation, Texas and Southwestern Cattle Raisers Association, Texas Cattle Feeders Association, Texas Association of Nurserymen, Inc., and Texas Farm Bureau. *Amici* generally in favor of abandonment of the rule of capture include Aqua Water Supply Corporation, Environmental Defense Fund, and National Spring Water Association.

**42.** *See* Tex. Water Code § 36.051; 36.059; 36.063–65.

**43.** *Gutierrez v. Collins,* 583 S.W.2d 312, 317 (Tex.1979).

cordingly, we affirm the court of appeals' judgment.

Justice HECHT filed a concurring opinion, in which Justice O'NEILL joined.

Justice HECHT, joined by Justice O'NEILL, concurring.

The people of Texas have given the Legislature, in article XVI, section 59 of the Texas Constitution, not only the power but the duty to "pass all such laws as may be appropriate" for the conservation, development, and preservation of the State's natural resources, including its groundwater.[1] The Legislature has concluded that local "[g]roundwater conservation districts ... are the state's preferred method of groundwater management."[2] Actually, such districts are not just the preferred method of groundwater management, they are the only method presently available. Yet in the fifty years since the Legislature first authorized the creation of groundwater conservation districts,[3] the record in this case shows that only some forty-two such districts have been created, covering a small fraction of the State. Not much groundwater management is going on.

The reason is not lack of groundwater. Twenty-nine aquifers underlie eighty-one percent of the State.[4] Nor is the reason lack of use. In 1992, groundwater sources supplied fifty-six percent of all water used in the State, including sixty-nine percent of agricultural needs and forty-one percent of municipal needs.[5] Nor is the reason lack of need of management. Over twenty-five years ago the Texas Senate's Interim Committee on Environmental Affairs warned of severe, impending problems with municipal groundwater use and called for comprehensive regulation.[6] The predicted problems have in fact occurred. The comprehensive revision of the Water Code in 1997[7] was motivated by what the Lieutenant Governor's general counsel has called "the seriousness of the situation": recurring droughts, expansive population growth, and dwindling water supplies.[8]

What really hampers groundwater management is the established alternative, the common law rule of capture,[9] which entitles a landowner to withdraw an unlimited amount of groundwater for any purpose other than willful waste or malice, and as long as he is not negligent in causing subsidence of nearby property.[10] When this Court adopted the rule of capture as a common-law rule ninety-five years ago in *Houston & Texas Central Railway. Co. v. East*,[11] we believed it to have been adopted in England and by the court of last resort in every state in this country except New Hampshire.[12] Thirty-five years later only

1. TEX. CONST. art. XVI, § 59(a) ("[T]he preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.").

2. TEX. WATER CODE § 36.0015.

3. Act of May 23, 1949, 51st Leg., R.S., ch. 306, 1949 Tex. Gen. Laws 559.

4. *See* John B. Ashworth & Janie Hopkins, *Aquifers of Texas*, TEXAS WATER DEV. BD. REPORT 345, at 1 (Nov.1995).

5. *See id.*

6. TEX. SEN. INTERIM COMM. ON ENVIRONMENTAL AFFAIRS, RECOMMENDATIONS OF THE COMMITTEE, 62nd Leg., 15, 18 (1973) ("Water Resources").

7. Act of June 1, 1997, 75th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws 3610.

8. *See* Martin Hubert, *Senate Bill 1, the First Big and Bold Step Toward Meeting Texas's Future Water Needs*, 30 TEX. TECH L.REV. 53, 55–56 (1999).

9. *See* Senator J.E. "Buster" Brown, *Senate Bill 1: We've Never Changed Texas Water Law This Way Before*, 28 ST. B. TEX. ENVTL. L.J. 152, 157 (1998).

10. *Friendswood Dev. Co. v. Smith–Southwest Indus., Inc.*, 576 S.W.2d 21, 25–30 (Tex.1978).

11. 98 Tex. 146, 81 S.W. 279 (1904).

12. *Id.* at 280 (citing *Acton v. Blundell*, 152 Eng. Rep. 1223 (Ex. Ch. 1843), and *Bassett v. Salisbury Mfg. Co.*, 43 N.H. 569 (1862)).

eleven of the eighteen western states still followed the rule of capture; after two more decades, only three western states still followed the rule.[13] Now there is but one lone holdout: Texas.[14]

The Court in *East* gave two reasons for adopting the rule of capture:

"(1) Because the existence, origin, movement, and course of such waters, and the causes which govern and direct their movements, are so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would, therefore, be practically impossible. (2) Because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage and agriculture, mining, the construction of highways and railroads, with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility." [15]

Neither remains valid. The extensive regulation of oil and gas production proves that effective regulation of migrant substances far below the surface is not only possible but necessary and effective. In the past several decades it has become clear, if it was not before, that it is not regulation that threatens progress, but the lack of it.

Neither respondent nor any of the more than a dozen amici curiae who have appeared in support of respondent's position attempt a principled argument for retaining the rule of capture. They focus instead on pragmatics. First, they say, the rule should not be abandoned because it has been the rule for a long time. The oft-cited wisdom of Justice Holmes is sufficient to rebut this argument:

It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.[16]

Second, respondent and its supporters argue that abandoning the rule of capture would be disruptive. To some extent they are right, of course, but the cost of such disruption must be balanced against the danger that the State's water supply will be threatened because of a lack of reasoned water planning. Studies on the subject seem rather uniformly to indicate that the balance tilts against the rule of capture.[17] Finally, respondent argues that water regulation is the Legislature's responsibility under the Constitution, and that the Court should not venture into the area. I agree that this argument has merit,[18] at least since 1917 when article XVI,

13. Robert Emmet Clark, *Ground Water Legislation in the Light of Experience in the Western States,* 22 MONT. L.REV. 42, 50 (1960).

14. Roger Tyler, *Underground Water Regulation in Texas,* 39 TEX. B.J. 532, 535 (1976); Richard S. Harnsberger, *Nebraska Ground Water Problems,* 42 NEB. L.R. 721, 727 (1963) ("Almost all of the contiguous seventeen Western states originally accepted the English rule by dictum or decision, but today only Texas appears to follow it.").

15. *East,* 81 S.W. at 281 (quoting *Frazier v. Brown,* 12 Ohio St. 294, 311 (1861)).

16. Oliver Wendell Holmes, Jr., *The Path of the Law,* 10 HARV. L.REV. 457, 469 (1897).

17. *See, e.g.,* Robert A. McCleskey, Comment, *Maybe Oil and Water Should Mix—At Least in*

*Texas Law: An Analysis of Current Problems with Texas Ground Water Law and How Established Oil and Gas Law Could Provide Appropriate Solutions,* 1 TEX WESLEYAN L.REV. 207 (1994); Lana Shannon Shadwick, Note, *Obsolescence, Environmental Endangerment and Possible Federal Intervention Compel Reformation of Texas Groundwater Law,* 32 SO. TEX. L.REV. 641 (1991); Karen H. Norris, Comment, *The Stagnation of Texas Ground Water Law: A Political v. Environmental Stalemate,* 22 ST. MARY'S L.J. 493 (1990); Corwin W. Johnson, *The Continuing Voids in Texas Groundwater Law: Are Concepts and Terminology to Blame?,* 17 ST. MARY'S L.J. 1281 (1986).

18. *See* Joe R. Greenhill & Thomas Gibbs Gee, *Ownership of Ground Water in Texas; The East Case Reconsidered,* 33 TEX. L.REV. 620, 629–630 (1955).

section 59 was adopted, but it comes ninety-five years too late: the Court entered the area of water regulation in *East* when it adopted the rule of capture. Does the Court intrude on the Legislature's constitutional responsibility and duty by maintaining the rule of capture or by abandoning it? It is hard to see how maintaining the rule of capture can be justified as deference to the Legislature's constitutional province when the rule is contrary to the local regulation that is the Legislature's "preferred method of groundwater management."

Dissenting in *City of Corpus Christi v. City of Pleasanton*,[19] Justice Will Wilson cautioned in 1955 that this Court would not forever use deference to the Legislature to justify maintaining the rule of capture in the face of changing circumstances.[20] After all, even if the Court abandoned the rule of capture as part of the common law, the Legislature could adopt the rule by statute—although given its stated regulatory preference, presumably it would not do so. Petitioners make a strong case for replacing the rule of capture with the beneficial purpose doctrine set out in section 858 of the *Restatement (Second) of Torts:*

Liability for Use of Ground Water

(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless

(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,

(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or

(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water.

(2) The determination of liability under clauses (a), (b) and (c) of Subsection (1) is governed by the principles stated in §§ 850 to 857.[21]

While neither section 858 nor any other common law rule of water regulation is preferable to almost any effective legislative solution, absent such a solution, section 858 is preferable to the rule of capture.

Nevertheless, I am persuaded for the time being that the extensive statutory changes in 1997, together with the increasing demands on the State's water supply, may result before long in a fair, effective, and comprehensive regulation of water use that will make the rule of capture obsolete. I agree with the Court that it would be inappropriate to disrupt the processes created and encouraged by the 1997 legislation before they have had a chance to work. I concur in the view that, for now—but I think only for now—*East* should not be overruled.

---

19.   154 Tex. 289, 276 S.W.2d 798 (1955).

20.   *Id.* at 805 (Wilson, J., dissenting).

21.   RESTATEMENT (SECOND) OF TORTS § 858 (1979).